UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, and<br><br>OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS,<br><br>　　Plaintiffs,<br><br>　　　v.<br><br>GLOBAL E-TRADING, LLC, a Florida limited liability company, also d/b/a CHARGEBACKS911,<br><br>GARY CARDONE, individually and as an officer of GLOBAL E-TRADING, LLC, and<br><br>MONICA EATON, individually and as an officer of GLOBAL E-TRADING, LLC,<br><br>　　Defendants. | **Case No. 8:23-cv-00795**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND STATUTORY RELIEF** |

Plaintiffs, the Federal Trade Commission ("FTC"), and the Office of the

Attorney General, State of Florida, Department of Legal Affairs ("Florida Attorney

General"), sue Global E-Trading, LLC, a Florida limited liability company, also

d/b/a Chargebacks911, Gary Cardone, individually and as an officer of Global

E-Trading, LLC, and Monica Eaton, individually and as an officer of Global

E-Trading, LLC, and for their Complaint allege:

**COMPLAINT**

-1-

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), which authorizes the FTC to seek, and the Court to order, permanent injunctive relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

2.     The Florida Attorney General brings this action under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501, Part II, Florida Statutes, to obtain equitable, permanent injunctive, and other statutory relief, including but not limited to restitution and civil penalties, for violations of FDUTPA in connection with Defendants' chargeback mitigation services, which are marketed and sold to their clients.

## SUMMARY OF CASE

3.     Defendants operate a chargeback mitigation business under the name "Chargebacks911."  Chargebacks911 helps merchants respond to consumer chargebacks.  Consumers can initiate chargebacks to dispute a charge on their credit card when, among other things, they believe that they have been subject to fraud or unfair business practices.  The merchant involved in a disputed transaction generally has an opportunity to refute the consumer's chargeback request and, if successful, retain the consumer's funds.  Chargebacks911 submits documentation to banks to dispute the validity of chargebacks that consumers have filed against its merchant clients.

4.      Since at least 2016, Chargebacks911 has, for numerous clients, used misleading information to contest chargebacks.  It has routinely submitted screenshots of webpages to support the claim that consumers were informed of terms and conditions that appeared on those pages, even in situations where consumers made the disputed purchase on a different webpage.

5.      Chargebacks911 has ignored red flags indicating that the webpage screenshots it has submitted to banks are misleading.  In some cases, the company has affirmatively edited webpage screenshots to add disclosures to the screenshot that did not appear on the underlying webpages.  These practices have likely resulted in consumers being denied chargebacks that otherwise should have been approved.

6.      In addition, from 2013 to 2019, Chargebacks911 offered a service, "Value Added Promotions" (or "VAP"), which enabled its clients to run small-value transactions, known as "microtransactions," that artificially lower a merchant's overall chargeback rate by inflating the total number of transactions run through the merchant's account.  Chargebacks911's VAP service enabled fraudulent merchants to evade or delay chargeback monitoring programs, fines, and account terminations designed to protect consumers from fraud.

7.      By disputing chargebacks with misleading information and manipulating merchants' chargeback rates, Chargebacks911 has engaged in unfair conduct in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the FTC's claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and this Court has supplemental jurisdiction over the Florida Attorney General's claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims brought under federal law that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the claims brought pursuant to Section 5(a) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 53(b).

9.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

10.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

11.    The Florida Attorney General is an enforcing authority of the FDUTPA.  The Florida Attorney General has conducted an investigation of the matters alleged herein, and this enforcement action serves the public interest.

12.    As an enforcing authority under FDUTPA, the Florida Attorney General is authorized to pursue this action seeking injunctive, equitable, and other statutory relief, including but not limited to restitution, disgorgement of ill-gotten monies, civil penalties and reimbursement of costs and attorneys' fees, pursuant to FDUTPA.

## DEFENDANTS

13.    Defendant Global e-Trading, LLC, also doing business as Chargebacks911 (hereinafter "Chargebacks911"), is a Florida limited liability company with its principal office or place of business at 18167 North US Highway 19, Clearwater, FL 33784.  At all times relevant to this Complaint, Chargebacks911 has transacted business in this District and throughout the United States.

14.    Defendant Gary Cardone is the CEO and co-founder of Chargebacks911.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Chargebacks911, including the acts and practices set forth in this Complaint.  In particular, Defendant Gary Cardone

marketed the company's services to new clients, negotiated pricing, and directed the company's "VAP" service (*see* Section F below).  Defendant Gary Cardone resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

15.     Defendant Monica Eaton is the COO and co-founder of Chargebacks911.  At all times relevant to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Chargebacks911, including the acts and practices set forth in this Complaint.  In particular, Defendant Monica Eaton headed the operational side of the company's chargeback dispute service, set company policies and procedures, trained employees, managed compliance, and was involved in the company's VAP service.  Defendant Monica Eaton resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## **COMMERCE**

16.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

17.     At all times relevant to this Complaint, Defendants engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes, by marketing, offering, and the provision of chargeback dispute services.

## DEFENDANTS' BUSINESS ACTIVITIES

### A. Background on the Chargeback System

18.     When consumers believe that they have been subject to fraud or unfair business practices, or when merchants fail to provide refunds that consumers are entitled to or make such refunds difficult to obtain, consumers may choose to dispute specific charges on their credit cards by seeking what is commonly known as a "chargeback."  Chargebacks therefore offer an important protection to consumers who use their credit cards to make purchases, especially when shopping online.

19.     Consumers initiate chargebacks by contacting their "issuing bank," which is the bank that issued the credit card to the consumer.  The issuing bank credits the consumer's account and notifies the merchant's "acquiring bank" of the chargeback.  The merchant then has an opportunity to dispute the chargeback by submitting documentation, known as a "representment," establishing that the charge is valid.  If the issuing bank decides that the charge is valid, it will debit the consumer's account for the disputed amount, reversing the initial credit to the account.  If the issuing bank decides that the charge is not valid, it seeks to recover

the chargeback amount from the acquiring bank, which, in turn, collects the chargeback amount from the merchant. If the merchant or consumer disagree with the issuing bank's decision, the chargeback may be escalated to additional stages of dispute resolution.

20.    Excessive chargebacks are a primary indicator that a merchant is engaged in fraudulent, illegal, or unauthorized practices. Accordingly, card networks, such as Visa, set thresholds for excessive chargebacks—for example, 100 or more chargebacks in one month, in combination with a monthly ratio of chargebacks to total transactions (or "chargeback rate") of 0.9% or greater. Merchants that exceed the card network thresholds are subject to additional monitoring requirements and, in some cases, penalties and termination.

### B. Background on Chargebacks911

21.    Since at least 2011, Chargebacks911 has offered chargeback mitigation services to merchants. A significant portion of Chargebacks911's client base has been composed of online merchants that engage in negative-option free trial marketing—whereby a consumer receives goods or services for free, or for a nominal fee, for a trial period, after which the merchant can automatically begin charging a fee unless the consumer affirmatively cancels—in particular, for nutritional supplements and skin care products.

22.     Chargebacks911 has offered merchants a variety of services, including disputing consumer chargebacks, monitoring and analyzing the merchant's chargeback statistics, providing preventative chargebacks alerts, and conducting an ostensible marketing service called Value-Added Promotions (or "VAP").

23.     Chargebacks911 has billed itself as "a global risk management and chargeback remediation solution developed by merchants, for merchants. . . . We don't just claim to be experts in chargeback reduction or dispute resolution: we spent years as successful online merchants ourselves, only to watch as chargebacks relentlessly chipped away at our profitability. . . . We took our experience as merchants and our expertise as industry leaders to create proprietary technologies and services that simply did not exist before . . . and have not been surpassed by any other source.  [After] honing the solution on our own business, we decided to share our wealth of knowledge and expertise with fellow merchants."

### C. Chargebacks911's Chargeback Disputes Service

24.     Since its inception, Chargebacks911 has assisted merchants in disputing chargebacks.

25.     Chargebacks911 has claimed in its ads that "[e]ach undisputed chargeback leaves money on the table," and that more than 80% of consumers who exercise their right to initiate a chargeback are actually engaged in "friendly

fraud"—in other words, the chargeback reason provided by the consumer is false, and it is the consumer who is defrauding the merchant, not the other way around.

26.     Three of the company's major clients, Apex Capital, LLC, F9 Advertising, LLC, and AH Media Group, LLC, have been sued by the FTC for engaging in deceptive negative-option marketing practices. Customers of these merchants reported that they had signed up for a free trial offer and were charged for an ongoing subscription without their knowledge or consent.

27.     Chargebacks911 disputed more than forty-seven thousand chargebacks for Apex Capital from January 2016 to November 2018, more than seventy-seven thousand chargebacks for AH Media and the related entity Zanelo, LLC, from January 2017 to July 2019, and more than forty-one thousand chargebacks for F9 Advertising from September 2016 to January 2018.

28.     To dispute consumer chargebacks, Chargebacks911 has drafted and submitted representations on behalf of its clients. The representation documents have included information that Chargebacks911 collects from the merchant and third-party information sources, as well as material generated by Chargebacks911.

29.     Chargebacks911's representations have typically included a set of screenshots purporting to represent key webpages from the merchant's website, including, for example, the product information page, the checkout page, and the terms and conditions page ("Representation Screenshots").

30.    Chargebacks911 has included the Representment Screenshots in its representations to show that the consumer filing the chargeback saw or should have seen disclosures about key offer terms, such as the free trial and subscription terms, on the merchant's website, and agreed to those terms in making a purchase.

31.    Instead of taking screenshots of the actual webpages that a consumer used to make the specific disputed purchase at issue in a chargeback, Chargebacks911 has typically used what it refers to as the merchant's "bank page," as described below.  Chargebacks911 has been aware that the bank page is not necessarily the actual webpage from which a consumer made the disputed purchase.

32.    To apply for credit card processing, merchants must provide their acquiring bank with a variety of information.  In the case of online merchants, they must provide the URL of the website that they intend to use to sell their products. Merchants typically submit the website's homepage.  When communicating with clients, Chargebacks911 has referred to this webpage as the "bank page," or "the URL you tell the bank you sell on."

33.    After capturing the Representment Screenshots from the merchant's bank page, Chargebacks911 has added markup and callout boxes highlighting, among other things, where disclosures purportedly are located on the webpage.

For an example of Chargebacks911's use of markup and callout boxes, see Figure A below.

34. Chargebacks911's representations have also typically included statements by Chargebacks911 that the consumer saw or should have seen disclosures about key offer terms, and agreed to those terms, including, for example:

     a. "The customer was provided with proper disclosures of a cancellation/refund/renewal policy";

     b. "Terms & Conditions are clearly displayed on our Check-out page"; and

     c. "The customer agreed to the terms and conditions prior to being charged."

### D. Chargebacks911 Has Ignored Red Flags that Its Chargeback Disputes Are Misleading

35. Chargebacks911 has ignored numerous red flags that have put the company on notice that its representations are inaccurate and misleading. For example, as described below, Chargebacks911 overlooked obvious mismatches in the branding of AH Media and Apex Capital products, facial inconsistencies in AH Media's website disclosures, conflicting website screenshots made public in lawsuits against Apex Capital and F9 Advertising, and suspicious behavior

involving the merchant accounts registered to Apex Capital, F9 Advertising, and AH Media. *See* Sections D.1–4 below.

36.     As a result, Chargebacks911 has submitted numerous representations that include Representment Screenshots that show disclosures that did not appear on the actual sales webpages that the consumer visited.  Numerous such representations have also falsely claimed that consumers saw or should have seen disclosures about key offer terms, and agreed to those terms.

37.     These misleading representations have made it more likely that an issuing bank would reject a consumer's chargeback request, despite the merchant failing to properly disclose material terms of a transaction to the consumer.

//

38.     For example, in numerous chargeback disputes for AH Media,
Chargebacks911 used webpage screenshots from AH Media's "bank pages," which
included disclosures about the offer's material terms.  The Representment
Screenshot excerpted in Figure A below depicts a webpage that requires consumers
to check a box acknowledging disclosure text concerning the subscription offer
before proceeding with the transaction.



**Fig. A: Excerpt of website screenshot from AH Media chargeback dispute**

39.     AH Media processed their actual sales, however, from consumer-
facing websites that lacked clear and conspicuous disclosures about the trial offers.
The screenshot excerpted in Fig. B below depicts an actual AH Media sales

webpage.  The page does not include any disclosures about the subscription terms, and consumers do not have to affirmatively acknowledge the terms of the offer before proceeding with the transaction.  As described below, Chargebacks911 knew or should have known that it was disputing chargebacks using Representation Screenshots that featured disclosures that did not appear on AH Media's actual sales webpages.



**Fig. B: Excerpt of payment page from AH Media actual sales website**

40.     Issuing banks have likely relied on the Representation Screenshots that Chargebacks911 included in AH Media representations, as well as the false claims that consumers agreed to the offer, in denying consumers chargebacks that otherwise would have been approved.

41.     Despite the red flags indicating that Chargebacks911's representations were misleading, the company continued with its same chargeback dispute practices, and chose not to investigate the accuracy of information provided by its negative-option clients, terminate negative-option clients providing misleading information, or notify banks that the representations it had previously submitted may have included misleading material.

42.     Indeed, Chargebacks911 has taken direct steps to prevent banks from assessing whether its clients are engaged in prohibited practices. For example, Chargebacks911's policy has been to omit URL information from its Representation Screenshots. In January 2016, Defendant Monica Eaton reminded Chargebacks911 employees with responsibilities for representations: "It is a policy that we never show any website address or URL on a screenshot. The reason for this is that if we show the bank a [URL] that is not registered to the [merchant account] related to a chargeback, the merchant will be liable for a fine of up to $250K and must prove that he is not making sales on this URL. I understand that sometimes merchants will give us incorrect URLs, but the only information we need to supply for the banks is an illustration to represent how the site operated (it is never our place to provide the [URL])."

### E. Branding Mismatches

43.     When preparing a chargeback dispute, Chargebacks911 has gathered data from the merchant concerning the product at issue in the chargeback, including the product's brand name.

44.     In thousands of instances, the branding of the product at issue in the chargeback has conflicted with the branding depicted in the Representment Screenshots.  Such conflicts indicate that the merchant may be engaged in a misleading or prohibited practice, such as conducting sales on a different website from the website registered to the merchant account, and, accordingly, that the Representment Screenshots may not depict the website that the consumer saw when purchasing the product.

45.     For example, when onboarding AH Media as a client, Chargebacks911 ignored conspicuous mismatches in branding between the chargeback data and the Representment Screenshots.

46.     Chargebacks911's typical practice has been to create an initial "test" representment as a template when onboarding a new client.  Chargebacks911 has scrutinized the test representment for accuracy.

47.     The test representment that Chargebacks911 created for AH Media around December 2016 involved a skin care product branded as "Lucienne," based on order information data that Chargebacks911 received from AH Media and

included in the test representment.  *See* Fig. C below ("Description: Lucienne

Vitamin C").



**Fig. C: Excerpt of order information from AH Media test representment**

//

48.    The Representment Screenshots included with the test representment, however, depicted a product branded as "Aehart."  *See* Fig. D below ("Aehart EYE SERUM").



**Fig. D: Excerpt of website screenshot from AH Media test chargeback**

49.    Despite the conspicuous evidence that the Representment Screenshots included in the AH Media test chargeback were from an entirely different website than the one the consumer visited when purchasing the Lucienne skin care product, Chargebacks911 failed to address the discrepancy.

50.    In fact, Chargebacks911 disputed more than two thousand chargebacks supposedly involving Aehart-branded websites from January 2017 to August 2018, but in only a handful of cases was the product actually branded as "Aehart" in the order information data.  In nearly all of the representations, the products were branded "Parisian Glow," "Lucienne," or "AmaBella Allure."  The data that revealed these discrepancies was readily available to Chargebacks911.  As with the test representment above, however, Chargebacks911 did not address these obvious conflicts.

51.    Chargebacks911 submitted representations for AH Media in numerous other cases in which the branding depicted in the chargeback's order information data was inconsistent with the Representation Screenshots.

//

52.     Similarly, Chargebacks911 submitted representations for Apex Capital using Representation Screenshots that were facially inconsistent with the chargeback's order information data.  For example, in numerous instances, Chargebacks911 disputed chargebacks lodged against Apex Capital for a supposed male enhancement product called "Evermax."  The Representation Screenshots that Chargebacks911 submitted, however, were branded "NeuroXR" and touted a purported cognitive enhancement product.  *See* Fig. E below (The "Merchant Name" field refers to "Evermax," but the site is branded "NeuroXR.").



**Fig. E: Excerpt of Representation Screenshot from
Apex Capital chargeback dispute (April 2016)**

53.    As with AH Media, Chargebacks911 failed to address the

inconsistencies in the Apex Capital representations.

### F. Inconsistencies in AH Media Disclosures

54.    Chargebacks911's typical practice has been to conduct an "initial

threat assessment" when onboarding a new client.  In the initial threat assessment,

Chargebacks911 has checked various aspects of the client's sales practices,

including its websites, confirmation emails, and customer service phone numbers.

Chargebacks911 has reviewed the client's websites for, among other things,

disclosures and checkboxes related to the client's subscription and sales practices.

55.    In December 2016, Chargebacks911 conducted an initial threat

assessment of certain AH Media bank pages.  The threat assessment noted that the

pages included a checkbox acknowledging the subscription terms as part of the

sales flow.  *See* Fig. F below.



**Fig. F: Screenshot excerpt from initial Chargebacks911 threat assessment
for client AH Media**

56.     Only a few weeks later, Chargebacks911 conducted a *second* threat assessment for AH Media on an entirely different set of URLs, writing to the client:  "This is the diagnostic report using *just your live sites* like you requested" (emphasis added).  Chargebacks911 noted in this second threat assessment that some of AH Media's "live sites" were missing the disclosures identified in the initial assessment on AH Media's bank pages.  *See* Fig. G below ("No recurring billing checkbox").  Accordingly, consumers making purchases on these "live sites" were not informed of the terms of the negative option subscription offer, and did not affirmatively express their consent to the offer.



**Fig. G: Screenshot excerpt of second Chargebacks911 threat assessment for client AH Media**

57.     Some of the "live sites" that were missing disclosures, according to this second threat assessment, were branded "Lucienne."  "Lucienne" is the same brand of the product that appeared in Chargebacks911's misleading test representation for AH Media.  *See* ¶ 47 above.  Although Chargebacks911 disputed

many chargebacks involving a Lucienne-branded product, it never used screenshots of a website that was actually branded Lucienne.

58.    The AH Media test representment, order information data, and threat assessments, taken together, indicated strongly that AH Media was selling its products from a different website (branded "Lucienne") than its bank pages (branded "Aehart"), and that the Lucienne-branded websites lacked disclosures that appeared on the Aehart-branded websites.

59.    Despite this evidence, Chargebacks911 continued using misleading Representment Screenshots to dispute chargebacks sought by consumers who had been deceived by AH Media's fraudulent marketing practices.

### G. The FTC's Lawsuits Against Apex Capital and F9 Advertising

60.    The FTC sued Apex Capital in November 2018.  At or around the time that the FTC sued Apex Capital, Defendants Gary Cardone and Monica Eaton became aware of the lawsuit.

61.    The FTC alleged, among other things, that Apex Capital's sales webpages inadequately disclosed key offer terms or lacked disclosures entirely. Screenshots in the complaint showed sales webpages that lacked disclosures of key offer terms and that did not include a checkbox acknowledging the subscription terms.

62.    Apex Capital was a client of Chargebacks911 at the time of the FTC lawsuit.  The screenshots that Chargebacks911 had used to dispute chargebacks on behalf of Apex Capital, which did include disclosures and a checkbox acknowledging the subscription terms, were inconsistent with the Apex Capital sales webpages described in, depicted in, and attached to the FTC's pleadings.  It was apparent from the allegations in the FTC's complaint that Chargebacks911 had likely used misleading Representment Screenshots to dispute Apex Capital chargebacks.

63.    Similarly, in February 2019, the FTC sued F9 Advertising.  Attorneys for the FTC sent an email to Chargebacks911 in connection with the F9 Advertising lawsuit on Feb. 26, 2019, and Defendant Monica Eaton forwarded the email internally the next day.  The owner of F9 Advertising was indicted in May 2019.

64.    The FTC alleged, among other things, that, from at least February 2016 through at least August 2017, F9 Advertising's sales webpages had inadequately disclosed key offer terms or lacked disclosures entirely.  Screenshots in the complaint showed sales webpages that used inconspicuous disclosures of key offer terms, or lacked disclosures entirely, and that did not include a checkbox acknowledging the subscription terms.

65.    The FTC also alleged that F9 Advertising had disputed chargebacks using misleading screenshots of "clean" sales webpages that F9 Advertising did not actually use to conduct sales.  The "clean" webpages included more-conspicuous disclosures and a checkbox.  The complaint included an example of these sanitized sales webpages.

66.    F9 Advertising had been a client of Chargebacks911 during the time at issue in the FTC lawsuit.  The screenshots that Chargebacks911 had used to dispute chargebacks on behalf of F9 Advertising did not match the actual sales webpages depicted and discussed in the FTC's complaint, but they were consistent with the misleading "clean" sales webpage.  It was therefore apparent from the allegations in the FTC's complaint that Chargebacks911 had likely used misleading Representment Screenshots to dispute F9 Advertising chargebacks.

67.    Even after becoming aware of the Apex Capital and F9 Advertising lawsuits, Chargebacks911 did not take meaningful steps to investigate whether the Representment Screenshots that it used to dispute chargebacks on behalf of its negative-option clients were misleading.  Instead, Chargebacks911 continued to dispute chargebacks on behalf of negative-option clients such as AH Media using misleading Representment Screenshots.

## H. Suspicious Behavior by Chargebacks911 Clients

68.     Suspicious behavior by numerous clients should have put Chargebacks911 on notice that those clients were engaged in misleading marketing practices.

69.     When merchants generate persistently high chargeback rates, acquiring banks may terminate their existing accounts and prevent them from opening new ones.  As a result, fraudulent merchants frequently open new merchant accounts to replace accounts that have been closed, and conduct sales though a large number of accounts to maintain access to payment processing as their accounts are closed.  In addition, fraudulent merchants may use numerous different corporate entities to open merchant accounts to prevent acquiring banks from linking the accounts to the merchant—which may be barred from opening new merchant accounts—and to secure more processing than would be allowed for a single merchant under acquiring bank underwriting standards.

70.     For Chargebacks911 to dispute chargebacks on a merchant's behalf, it needs access to information about the client's merchant accounts, including the name of the nominal entity that registered the account.

71.     Accordingly, Chargebacks911 should have been alerted to potential misconduct when its clients conducted sales using a revolving door of merchant

accounts registered to many different corporate entities, especially when the merchant used those accounts to sell the same or similar products.

72.    Chargebacks911, however, has disregarded red flags in its clients' behavior and continued to dispute chargebacks filed against them.  For example:

a.    From January 2016 to July 2018, Chargebacks911 disputed more than five thousand chargebacks for Apex Capital related to a single product ("Evermax") despite the fact that the product was sold through more than one hundred separate merchant accounts.  In total, Chargebacks911 fought chargebacks filed against Apex Capital on nearly three hundred separate merchant accounts registered to more than thirty different corporate entities.

b.    From January 2017 to January 2018, Chargebacks911 disputed more than twenty thousand chargebacks for F9 Advertising related to a single product ("Revived Youth Cream") that was sold on nearly two hundred separate merchant accounts.  In total, Chargebacks911 fought chargebacks filed against F9 Advertising on more than two hundred and twenty separate merchant accounts registered to more than forty different corporate entities.

c.    From February 2017 to April 2019, Chargebacks911 disputed more than ten thousand chargebacks for AH Media related to a single

product ("Parisian Glow Skin Cream") that was sold on more than one hundred and fifty separate merchant accounts. In total, Chargebacks911 fought chargebacks filed against AH Media and the related entity Zanelo on more than four hundred merchant accounts registered to nearly one hundred separate corporate entities.

73.     A pattern of persistently high chargeback rates is also indicative of misleading marketing practices. Numerous Chargebacks911 clients have consistently generated high chargeback rates for extended periods of time. For example, from April 2017 through March 2019, the combined chargeback rate for all AH Media domestic merchant accounts monitored by Chargebacks911 did not drop below 1% in any single month, and regularly exceeded 6%. AH Media's combined domestic chargeback rate for that entire twenty-four-month time period was more than 6%.

74.     Similarly, from October 2015 through September 2018, the combined chargeback rate for all Apex Capital domestic merchant accounts monitored by Chargebacks911 did not drop below 1% in any single month, and regularly exceeded 4%. Apex Capital's combined domestic chargeback rate for that entire thirty-six-month period exceeded 3%. The combined rate for Apex Capital's offshore merchant accounts over the same period was nearly 5%.

75.     Moreover, as described in Section F below, Apex Capital used Chargebacks911's VAP service to artificially lower its chargeback rate.  Apex Capital's rates would have been even higher without the use of VAP.  Indeed, that Apex Capital resorted to VAP to avoid chargeback monitoring was itself a major red flag about its marketing practices.

76.     At no point, however, did Chargebacks911 seek to ensure that its representments were accurate by looking into the marketing practices of Apex Capital, AH Media, or other clients whose transaction and chargeback data exhibited troubling patterns.

### I.  Chargebacks911 Has Affirmatively Altered the Representment Screenshots

77.     For some clients, Chargebacks911 has doctored the Representment Screenshots to add disclosures that would support the merchant's case.  For example, in the 2016 to 2017 timeframe, Chargebacks911 added disclosure language to the Representment Screenshots it took for a client selling products related to weight loss.  In 2017, Chargebacks911 blurred out the disclosure in Representment Screenshots it took for a client that operated a pornographic website and superimposed disclosure language that would help win chargeback disputes.

78.     Representation Screenshots that have been altered to add or modify disclosures are likely to mislead the banks reviewing those chargeback disputes, and could result in consumers losing valid chargeback requests.

### J.  Chargebacks911 Offered Clients Microtransactions to Lower Their Chargeback Rate

79.     From 2013 to 2019, Chargebacks911 offered a select group of clients access to its so-called Value-Added Promotions, or "VAP," service.  VAP was ostensibly designed to help merchants generate sales from their existing customers or prospective customers.  The promotional trappings of VAP were merely a pretext, however, for the service's true purpose—artificially lowering the client's chargeback rate.

80.     VAP involved running small-value transactions (e.g., $1.95) through a client's merchant accounts using prepaid gift cards.  Small-value transactions that do not reflect bona fide sales to consumers are commonly referred to as "microtransactions."  Running microtransactions through a merchant account inflates the total number of transactions, and thereby artificially lowers the account's monthly chargeback rate, which is calculated as the number of chargebacks requested divided by the total number of transactions processed on the merchant account.  Fraudulent merchants that are able to manipulate their chargeback rate can evade or delay scrutiny, and consequently maintain or prolong their access to merchant accounts.  *See* ¶ 20 above.

81.     Chargebacks911 actively participated in effecting VAP microtransactions in a variety of ways.  Chargebacks911 procured the gift cards for clients, provided calculations of the number of VAP transactions that had to be run through a given merchant account by the end of the month to ensure that the chargeback ratio would drop below a certain threshold, and caused the VAP transactions to occur.

82.     Typically, the VAP client would supply Chargebacks911 with a list of current or prospective customers.  Chargebacks911 would associate each VAP charge with a specific consumer and trigger the VAP charge.  The consumer received an email saying that they could claim the promotional credit by calling a customer service phone number.  In reality, few consumers called to claim the credit.  Regardless of whether the consumer claimed the credit, however, the transaction would count toward the merchant's total transactions for the month.

83.     Internal emails demonstrate that Defendants Gary Cardone and Monica Eaton were aware of the service's true purpose.  For example:

a.     In May 2016, Defendant Gary Cardone wrote to a VAP client: "[I]t looks like you need 6775 [VAP transactions] based on current stats at [a target chargeback rate of] 2.75% . . . ."

b.      In September 2016, Defendant Monica Eaton wrote to

Defendant Gary Cardone reminding him to help a client with VAP, noting

that "this would help guarantee his [merchant accounts] are open."

c.      In April 2017, a Chargebacks911 employee wrote to

Defendants Gary Cardone and Monica Eaton about a client, "They need

triage to lower ratio.  I suggest we just get them on vap."

84.      In addition, various internal glossaries and training documents

referred to the true purpose of VAP.  For example, the glossary in a

Chargebacks911 "Client Relations Manual" explained that VAP's purpose was "to

reduce or dilute the chargeback ratio by increasing the transaction count with

supplemental transactions in addition to the regular sales."

85.      Internal emails also demonstrate that Chargebacks911 sought to

conceal the service's true purpose.  For example:

a.      In April 2017, Defendant Gary Cardone wrote to a

Chargebacks911 employee to express his concern that a VAP client was

waiting until too late in the month to run VAP, because running numerous

small-value transactions at the end of the month would be a red flag for the

client's acquiring bank:  "[I] [don't] like the way [a client is] running vap,

too much all too late…let's get a call with [the client] and say dude, . . .

either run this stuff or don't but it's too cheap [to] run this way and [it's] going to alert their [acquirers] . . . ."

    b.    In June 2016, a VAP client asked a Chargebacks911 employee to initiate VAP transactions at a slow pace to avoid detection: "[S]ince it's a bigger order [of VAP] can [you] drip them a little slower to not make it look suspicious[?]" The Chargebacks911 employee responded: "No problem . . . ."

86.    More than 30 merchants used Chargebacks911's VAP service, including Apex Capital. Chargebacks911 was involved in more than four million individual VAP transactions.

87.    Chargebacks911's VAP service harmed consumers by delaying the consequences faced by online merchants that generated a significant number of chargebacks. For example:

    a.    Referring to one large VAP client, Defendant Gary Cardone claimed in a September 2016 internal email, "[We] got them out of the ECP excessive chargeback program."

    b.    A Chargebacks911 employee wrote in an April 2017 internal email about a client: "They are in the visa program and using vap to get out."

88.     Chargebacks911 typically charged merchants a fee between $1–2 per VAP transaction.  Altogether, Chargebacks911 took in more than $6 million from its VAP service.

### K.  Role of Individual Defendants

89.     Defendant Gary Cardone co-founded Chargebacks911 with his wife Defendant Monica Eaton, and he has been the CEO of the company since nearly its founding.  His responsibilities have included marketing the company's chargeback dispute service and VAP service to prospective clients.  He has negotiated pricing for the services and signed contracts with clients, including Apex Capital and AH Media.  He also directed the operations of the VAP service.

90.     Defendant Monica Eaton has been the COO of Chargebacks911 since the company was founded.  She has directed the operations of the company's chargeback dispute service, including setting company policies and procedures, training employees, and managing compliance.  In the course of these duties, she has reviewed test chargebacks, initial threat assessments, and quarterly reporting for clients.  She devised the VAP service together with Defendant Gary Cardone, and was involved in administering it.

91.     Defendants Gary Cardone and Monica Eaton have been on notice that Chargebacks911's chargeback dispute service has relied on misleading documentation.  For example, Defendant Monica Eaton has been deeply involved

in the operational side of the represment service, *see* ¶ 90 above, and they both were aware of the FTC's lawsuit against Apex Capital.  *See* ¶¶ 60–66 above.  They were also aware of the VAP service's true purpose and actively participated in administering VAP.  *See, e.g.*, ¶¶ 83, 85, 87 above.

### L.  Defendants' Unlawful Conduct

92.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:

a.    Defendants engaged in their unlawful acts and practices over a period of several years;

b.    Defendants continued their unlawful acts or practices with respect to chargeback disputes despite their awareness of numerous red flags;

c.    Defendants engaged in their unlawful acts and practices with respect to microtransactions knowingly; and

d.    Defendants remain in the chargeback mitigation business and maintain the means, ability, and incentive to continue or resume their unlawful conduct.

## <u>VIOLATIONS OF THE FTC ACT</u>

93.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

94.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

### Count I

### Unfairly Injuring Consumers by Submitting Misleading Chargeback Documentation

95.    As described in Paragraphs 35–78 above, in numerous instances, Defendants have submitted to financial institutions, on behalf of their clients, misleading or inaccurate documentation in connection with disputing consumer chargeback requests.

96.    Due to Defendants' actions, numerous consumers have likely been denied a chargeback of the disputed transaction.  Defendants' actions have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

97.     Therefore, Defendants' acts or practices as set forth in Paragraph 95 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a), (n).

## Count II

## Unfairly Injuring Consumers by Administering a Microtransactions Service

98.     As described in Paragraphs 79–88 above, in numerous instances, Defendants have effected, or caused to be effected, microtransactions that artificially lowered a merchant's overall chargeback rate by inflating the total number of transactions run through the merchant's account.

99.     Due to Defendants' actions, fraudulent online merchants were likely able to evade or delay detection by chargeback monitoring systems, and thus likely avoided or forestalled monitoring programs, penalties, and terminations that would have protected consumers.  Defendants' actions have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

100.   Therefore, Defendants' acts or practices as set forth in Paragraph 98 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a), (n).

## VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

101.    The purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2).

102.    Under FDUTPA, unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.  Fla. Stat. § 501.204(1).

### Count III (Against Chargebacks911) (By Plaintiff Florida Attorney General)

103.    As set forth in Paragraphs 1–15 and 17–88 above, which allegations are incorporated as if set forth herein, Chargebacks911 has committed acts and practices that are unfair or deceptive in violation of FDUTPA.

104.    In the course of Chargebacks911's trade or commerce, Chargebacks911 has violated FDUTPA by submitting misleading or inaccurate documentation in connection with disputing consumer chargeback requests on behalf of their clients, as more fully described above in Paragraphs 35–78.  Due to Chargebacks911's actions, numerous consumers were likely denied a chargeback of the disputed transaction.

105.    In the course of Chargebacks911's trade or commerce, Chargebacks911 has violated FDUTPA through its VAP service by effecting, or

causing to be effected, microtransactions that artificially lowered a merchant's overall chargeback rate by inflating the total number of transactions run through the merchant's account, as more fully described above in Paragraphs 79–88. Due to these actions, fraudulent online merchants were likely able to evade or delay detection by chargeback monitoring systems, and thus likely avoided or forestalled monitoring programs, penalties, and terminations that would have protected consumers.

106. The actions and related business practices of Chargebacks911 as set forth in this Complaint shock the conscience.

107. Through the actions and related business practices set forth in this Complaint, Chargebacks911 is committing acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

108. Chargebacks911's actions and related business practices set forth in this Complaint cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

109. Therefore, Chargebacks911 engaged in unfair or unconscionable acts or practices in the conduct of trade or commerce in violation of Section 501.204(1), Florida Statutes.

110.    Chargebacks911 should be subject to civil penalties for willful violations of FDUTPA in the amount of Ten Thousand Dollars ($10,000) for each violation pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized, or attempted to victimize, a senior citizen pursuant to Section 501.2077, Florida Statutes.

111.    Chargebacks911 engaged in and could continue to engage in deceptive and unfair acts and practices in that Chargebacks911 knew or should have known that the methods, acts, or practices alleged herein were and are unfair, deceptive, unconscionable, and prohibited by law.

112.    These above-described acts and practices of Chargebacks911 have caused substantial injury to the public and will likely continue to cause injury and prejudice the public.

113.    Unless Chargebacks911 is permanently enjoined from engaging further in the acts and practices complained of herein, Chargebacks911's actions will continue to result in irreparable injury to the public for which there is no adequate remedy at law.

### Count IV (Against Gary Cardone)
### (By Plaintiff Florida Attorney General)

114.    As set forth in Paragraphs 1–15, 17–89, and 91 above, which allegations are incorporated as if set forth herein, Gary Cardone has committed acts and practices that are unfair or deceptive in violation of FDUTPA.

115.    Under FDUTPA, once corporate liability is established, an individual defendant may be individually liable if he participated directly in the deceptive or unfair practices or acts or he possessed the authority to control them.  Therefore, Paragraphs 104–13 above are incorporated as if set forth herein, which relate to the corporate liability of Chargebacks911.

116.    Gary Cardone is a co-founder of Chargebacks911 and at all times relevant to this action, he has been the CEO and in charge of the operations of Chargebacks911.

117.    At all times relevant to this action, Gary Cardone has had personal knowledge and control of Chargebacks911's business practices at issue in this Complaint, including but not limited to the acts and practices related to chargeback dispute services and the VAP service.

118.    At all times relevant to this Complaint, acting alone or in concert with others, Gary Cardone has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Chargebacks911, including the acts and practices set forth in this Complaint.

119.    At all times relevant to this Complaint, Gary Cardone has marketed Chargebacks911's chargeback dispute services to new clients.

120.   At all times relevant to this Complaint, Gary Cardone has been aware, or should have been aware, that Chargebacks911's chargeback services relied on misleading documentation when submitting representations.

121.   Even after learning of the FTC's suit against client, Apex Capital, Gary Cardone had the ability to control but did not change any business practices regarding Chargebacks911's chargeback dispute services, including but not limited to using misleading or inaccurate documentation or only using "bank pages" for representments.

122.   At times relevant to this action, Gary Cardone negotiated pricing for services and signed contracts on behalf of Chargebacks911 with clients.

123.   At times relevant to this action, Gary Cardone was not only aware of the company's VAP service and its true purpose, he also directed the operations of the VAP service, including but not limited to directing Chargebacks911 employees as to how the VAP service should be administered to avoid detection by the merchants' acquiring banks.  Even though Gary Cardone was aware of the company's VAP service and its true purpose, or at a minimum, he should have been aware of the intent behind the VAP service, he did nothing to terminate or change such business practices.

124.   At times relevant to this action, Gary Cardone also communicated with Chargebacks911's clients as to how to use the VAP service to achieve a target chargeback rate.

125.   Through the actions and related business practices set forth in this Complaint, Gary Cardone has committed or is committing acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

126.   The actions and related business practices of Chargebacks911, and of Gary Cardone as CEO of Chargebacks911, as set forth in this Complaint shock the conscience.

127.   Through the actions and related business practices set forth in this Complaint, Gary Cardone is engaging in or has engaged in acts or practices that have caused substantial injury to consumers. This substantial injury is not reasonably avoidable by the consumers themselves and is not outweighed by countervailing benefits to consumers or competition.

128.   Thus, Gary Cardone is engaged in or has engaged in unfair, deceptive, or unconscionable acts or practices in the conduct of trade or commerce in violation of Section 501.204(1), Florida Statutes.

129.   Gary Cardone should be subject to civil penalties for willful violations of FDUTPA in the amount of Ten Thousand Dollars ($10,000) for each violation

pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized, or attempted to victimize, a senior citizen pursuant to Section 501.2077, Florida Statutes.

130.   At all times material to this action, Gary Cardone has willfully engaged in and continues to engage in deceptive and unfair acts and practices in that he knew or should have known that the methods, acts, or practices alleged herein were and are unfair, deceptive, unconscionable, and prohibited by law.

131.   Unless Gary Cardone is permanently enjoined from engaging further in the acts and practices complained of herein, his actions will continue to result in irreparable injury to the public for which there is no adequate remedy at law.

### Count V (Against Monica Eaton)
### (By Plaintiff Florida Attorney General)

132.   As set forth in Paragraphs 1–15, 17–88, and 90–91 above, which allegations are incorporated as if set forth herein, Monica Eaton has committed acts and practices that are unfair or deceptive in violation of FDUTPA.

133.   Under FDUTPA, once corporate liability is established, an individual defendant may be individually liable if he participated directly in the deceptive or unfair practices or acts or he possessed the authority to control them.  Therefore, Paragraphs 104–13 above are incorporated as if set forth herein, which relate to the corporate liability of Chargebacks911.

134.   Monica Eaton is a co-founder of Chargebacks911 and at all times relevant to this action, she has been the COO and has controlled the day-to-day operations of Chargebacks911.

135.   At all times relevant to this action, Monica Eaton has had personal knowledge and control of Chargebacks911's business practices at issue in this Complaint, including but not limited to the acts and practices related to chargeback dispute services and the VAP service.

136.   At all times relevant to this Complaint, acting alone or in concert with others, Monica Eaton has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Chargebacks911, including the acts and practices set forth in this Complaint.

137.   At all times relevant to this Complaint, Monica Eaton has directed the operations of the Chargebacks911's chargeback dispute service, including setting company policies and procedures, training employees, and managing compliance. In the course of these duties, she has reviewed test chargebacks, initial threat assessments, and quarterly reporting for clients.

138.   At all times relevant to this Complaint, Monica Eaton has been aware that Chargebacks911's chargeback services relied on misleading documentation when submitting representations.

139.   As further discussed in Paragraph 29 above, Monica Eaton directed Chargebacks911's employees to remove information from screenshots presented to banks, specifically the website address or URL on the Representment Screenshots.

140.   Even after learning of the FTC's suit against clients, Apex Capital and F9 Advertising, Monica Eaton had the ability to control but did not change any business practices regarding Chargebacks911's chargeback dispute services, including but not limited to using misleading or inaccurate documentation or only using "bank pages" for representments.

141.   Monica Eaton devised the VAP service together with Defendant, Gary Cardone, and at all times relevant to this Complaint, she was actively involved in administering Chargebacks911's VAP service.

142.   At all times relevant to this Complaint, Monica Eaton was aware of the company's VAP service and its true purpose, or at a minimum, she should have been aware of the intent behind the VAP Service, and she did nothing to terminate or change such business practices.

143.   Through the actions and related business practices set forth in this Complaint, Monica Eaton has committed or is committing acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.

144.    The actions and related business practices of Chargebacks911, and of Monica Eaton as COO of Chargebacks911, as set forth in this Complaint shock the conscience.

145.    Through the actions and related business practices set forth in this Complaint, Monica Eaton is engaging in or has engaged in acts or practices that have caused substantial injury to consumers.  This substantial injury is not reasonably avoidable by the consumers themselves and is not outweighed by countervailing benefits to consumers or competition.

146.    Thus, Monica Eaton is engaged in or has engaged in unfair, deceptive, or unconscionable acts or practices in the conduct of trade or commerce in violation of Section 501.204(1), Florida Statutes.

147.    Monica Eaton should be subject to civil penalties for willful violations of FDUTPA in the amount of Ten Thousand Dollars ($10,000) for each violation pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized, or attempted to victimize, a senior citizen pursuant to Section 501.2077, Florida Statutes.

148.    At all times material to this action, Monica Eaton has willfully engaged in and continues to engage in deceptive and unfair acts and practices in that she knew or should have known that the methods, acts, or practices alleged herein were and are unfair, deceptive, unconscionable, and prohibited by law.

149.   Unless Monica Eaton is permanently enjoined from engaging further in the acts and practices complained of herein, her actions will continue to result in irreparable injury to the public for which there is no adequate remedy at law.

## CONSUMER INJURY

150.   Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the Florida Deceptive and Unfair Trade Practices Act.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and FDUTPA by Defendants and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, who receive actual notice of the injunction;

B.    Award monetary and other relief within the Court's power to grant;

C.    Enter a judgment in favor of the Florida Attorney General against Chargebacks911 on Count III;

D.    Enter a judgment in favor of the Florida Attorney General against Gary Cardone on Count IV;

E.      Enter a judgment in favor of the Florida Attorney General against Monica Eaton on Count V;

F.      Award such legal, equitable or other relief against Defendants, jointly and severally, as is just and appropriate pursuant to Section 501.207(3), Florida Statutes, including but not limited to restitution to consumers and disgorgement of all ill-gotten gains;

G.      Assess civil penalties against Defendants, jointly and severally, in the amount of Ten Thousand Dollars ($10,000) for each violation for each violation of Chapter 501, Part II, Florida Statutes, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000) for each violation that victimized, or attempted to victimize, a senior citizen in accordance with Section 501.277(2), Florida Statutes;

H.      Award the Florida Attorney General all expenses in bringing and maintaining this action, including reasonable attorneys' fees and costs pursuant to Sections 501.2105 and 501.2075, Florida Statutes, and as otherwise may be allowable by applicable statutes or law; and

I.      Award any additional relief as the Court determines to be just and proper, including but not limited to all equitable relief allowed pursuant to Section 501.207(3), Florida Statutes.

Respectfully submitted,

Dated:  April 12, 2023

EVAN ROSE (Lead Counsel)
Cal. Bar No. 253478
ROBERTA DIANE TONELLI
Cal. Bar No. 278738
90 Seventh St, Suite 14-300
San Francisco, CA 94103
Email: erose@ftc.gov; rtonelli@ftc.gov
Tel: (415) 848-5100; Fax: (415) 848-5184

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION


ASHLEY MOODY
ATTORNEY GENERAL

Jennifer Hayes Pinder (Lead Counsel)
Assistant Bureau Chief, Tampa
Fla. Bar No.: 17325
Email: Jennifer.Pinder@myfloridalegal.com
Office of the Attorney General
Department of Legal Affairs
3507 East Frontage Rd, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515