UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION, and

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA, DEPARTMENT OF
LEGAL AFFAIRS,

    Plaintiffs,

        v.

GLOBAL E-TRADING, LLC, a Florida
limited liability company, also d/b/a
CHARGEBACKS911,

GARY CARDONE, individually and as an
officer of GLOBAL E-TRADING, LLC, and

MONICA EATON, individually and as an
officer of GLOBAL E-TRADING, LLC,

    Defendants.

Case No. 8:23-cv-796-MSS-CPT

**PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION
TO DISMISS**

# I.    INTRODUCTION

The Federal Trade Commission ("FTC") and the Office of the Attorney General, State of Florida, Department of Legal Affairs ("Florida AG") (jointly, "Plaintiffs") initiated this lawsuit against Defendants Global E-Trading, LLC (dba "Chargebacks911"), Gary Cardone, and Monica Eaton (collectively, "Defendants") for their unfair practices related to chargeback mitigation services in violation of the Federal Trade Commission Act ("FTC Act") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").[1] *See* 15 U.S.C. § 45; Chapter 501, Part II, Florida Statutes.  As detailed in Plaintiffs' Complaint (Dkt. #1), Defendants disputed consumers' chargeback requests with misleading information and used microtransactions to undermine fraud monitoring systems that protect consumers.

Defendants' amended motion to dismiss the Complaint (Dkt. #26 ("Motion")) should be denied.  Plaintiffs' claims easily satisfy the low threshold for defeating a motion to dismiss.  The Complaint's detailed allegations will allow this Court to draw a reasonable inference that Defendants' chargeback dispute and microtransactions practices are unfair, and therefore dismissal is not appropriate.  Further, Plaintiffs sufficiently allege that injunctive relief is available in this matter to prevent future harm.  *See* 15 U.S.C. § 53(b); Fla. Stat. § 501. 207(b).

## II.    LEGAL STANDARD ON MOTION TO DISMISS

This Court has previously held that "[t]he threshold for surviving a motion to

---

[1] Consumers can initiate chargebacks to dispute a charge on their credit card when they believe that they have been subject to fraud or unfair business practices. (Compl. ¶ 3.)

dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a low one." *See, e.g.*, *Tibbetts Lumber Co. v. Amerisure Ins. Co.*, 451 F. Supp. 3d 1295, 1300 (M.D. Fla. 2020) (citing *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989 (11th Cir. 1983)).  "A plaintiff must plead only enough facts to state a claim to relief that is plausible on its face." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).  Plaintiffs must "provide the grounds for [their] entitlement to relief," but the complaint "does not need detailed factual allegations." *Id.* (quotations omitted).  Further, when "evaluating the sufficiency of a complaint . . . , the well pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff" (though "the court should not assume that the plaintiff can prove facts that were not alleged").  *Id.*  Dismissal is not warranted unless "there is a dispositive legal issue which precludes relief." *Id.*

In order to state a claim for unfairness, both Plaintiffs must allege that an act or practice (a) "causes or is likely to cause substantial injury to consumers," (b) "which is not reasonably avoidable by consumers themselves," and (c) which is "not outweighed by countervailing benefits to consumers or to competition." *See* 15 U.S.C. § 45(n);[2] *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1098 (Fla. 3d DCA 2014); *see also Martorella v. Deutsche Bank Nat'l Trust Co.*, No. 12-cv-80372, 2015

---

[2] The Eleventh Circuit has held that, under the FTC Act, the practice must also violate well-established public policy.  *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 n.24 (11th Cir. 2018). Defendants do not raise the public policy element in their Motion.

WL 11347664, *5 (S.D. Fla. Aug. 6, 2015).[3]

## III.    ARGUMENT

**A.    The Complaint sufficiently alleges Defendants' misleading chargeback dispute practices have caused or are likely to cause substantial injury.**

### 1.    Causation

The Complaint traces a straight line from Defendants' misconduct to consumer injury:  Consumers have reported to their banks that they had been charged without their knowledge and consent (Compl. ¶ 26); Defendants have submitted representations purporting to show that consumers knew about and consented to the charges (*id.* ¶¶ 30, 34, 36); and, as a result, banks likely have been misled into denying the consumers' valid chargebacks (*id.* ¶¶ 37, 40).  Connecting these dots is all that is necessary to show that Defendants' practices have caused or are likely to cause substantial injury to consumers.[4]  Furthermore, Plaintiffs are not required to identify the specific injured consumers or provide individual consumer information when bringing suit under FDUTPA or the FTC Act.  *See Fla., Office of Att'y Gen., Dep't of Legal Aff. v. Beach Blvd Auto., Inc.*, 139 So. 3d 380, 394 (Fla. 1st

---

[3] The Florida Legislature stated in FDUTPA that, when construing FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the Federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s., 45(a)(1) as of July 1, 2015."  Section 501.204(2), Florida Statutes.  Also, some Florida courts have used a different standard for unfairness under FDUTPA:  "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2nd DCA 2006).  However, Defendants have not relied on this standard in their Motion.

[4] Defendants misstate the standard for unfairness, claiming that Plaintiffs must allege that Defendants' misconduct "did in fact cause" or "caused or will cause" consumer harm.  (*See* Mot. at 6–7 (emphasis in original).)  As noted above, *see* Section II, the correct standard is that the act or practice "causes or is likely to cause substantial injury."

DCA 2014); *see also Taubert v. Fla., Office of Att'y Gen.*, 79 So. 3d 77, 80 (Fla. 1st DCA 2011) (affirming the denial of motion to dismiss for failure to identify harmed consumers under FDUTPA and noting that "[r]equiring that each consumer be named in the complaint for these types of actions would unnecessarily burden the courts and the enforcing body"); *cf. FTC v. Affiliate Strategies, Inc.*, No. 09-4104-JAR-KGS, 2010 WL 11470099, at *5 (D. Kan. June 4, 2010) (holding in deception case that "demanding allegations of each individualized act . . . of deception is inconsistent with [the purpose of the FTC Act]") (quotation omitted).

Defendants' practices parallel the misconduct addressed in *FTC v. Neovi*, 604 F.3d 1150 (9th Cir. 2010). The *Neovi* defendants were held liable for unfair practices because their website, which "created and delivered unverified checks," was "highly vulnerable to con artists and fraudsters." 604 F.3d at 1153–54. The court held, at summary judgment, that the defendants' "profound lack of diligence, coupled with . . . affirmative acts" was sufficient for an unfairness claim. *Id.* at 1153. Here, too, Defendants' liability derives from their profound lack of diligence and affirmative acts in submitting misleading information to dispute chargebacks.[5]

Defendants try to obfuscate their role in the scheme (*see* Mot. at 10), but their misleading statements to banks that consumers consented to charges are squarely material to the banks' decisions. There is only one logical reason that fraudulent

---

[5] To the extent Defendants' Motion implies otherwise, *Neovi* does not require that a defendant cause injury to consumers that is entirely independent from injury caused by fraudulent third parties. (*See* Mot. at 8 (coining phrase "independently injurious").)

-4-

merchants, like those discussed in the Complaint (Apex Capital, AH Media, and F9 Advertising), paid Defendants to submit tens of thousands of misleading representations over the course of several years (*see* Compl. ¶ 27)—the scheme works. And regardless of Defendants' "ill intentions," "the injury [is] a predictable consequence" of their actions.  *See Neovi*, 604 F.3d at 1156.  Indeed, defeating chargebacks is not just a predictable consequence here—it is the entire point of Defendants' actions.  (*See* Compl. ¶¶ 24–25, 30, 33–34, Fig. A.)

Defendants also seek to dodge responsibility by claiming that they merely offer a "clerical service" and that the merchant provides the evidence for each representation.[6]  (*See* Mot. at 10.)  Even if this argument were consistent with the allegations in the Complaint, "[t]his spin ignores the fact that [Defendants] created and controlled a system that facilitated fraud and that the company was on notice" that it was submitting misleading information.  *See Neovi*, 604 F.3d at 1155; *see also CFPB v. Universal Debt & Payment Solutions, LLC*, No. 1:15-CV-00859-RWS, 2015 WL 11439178, at *18 (N.D. Ga. Sept. 1, 2015) (finding that there was "a sufficiently close connection between [the defendant] ignoring signs of abusive practices and the harm that resulted")[7]; *FTC v. Windward Mktg., Ltd.*, No. Civ. A. 1:96-CV-615F, 1997 WL 33642380, at *11–13 (N.D. Ga. Sept. 30, 1997) (holding defendant liable at

---

[6] This claim miscites the Complaint, which alleges that representations have also "included information that Chargebacks911 collects from . . . third-party information sources, as well as material generated by Chargebacks911."  (Compl. ¶¶ 28, 77–78.)

[7] *Universal Debt* also notes that "even if the evidence in *Neovi* is more compelling, the case was on summary judgment and benefitted from discovery."  2015 WL 11439178, at *17.  Here, Plaintiffs need only state a plausible claim.

summary judgment because it knew or was on notice that it deposited unauthorized bank drafts).  In drafting and submitting representations (Compl. ¶ 28), Defendants have ignored repeated red flags that their website screenshots are misleading and inaccurate (*id.* ¶¶ 43–67) and have disregarded suspicious behavior by merchants that put them on notice that merchants were engaged in fraud.  (*Id.* ¶¶ 68–75).  In some instances, Defendants have affirmatively doctored screenshots or concealed damaging information to bolster a merchant's case.  (*Id.* ¶¶ 42, 77–78.)  These allegations, taken together, depict a company "that [has] turned a blind eye to fraudulent business made possible only through" the company's services, *see Neovi*, 604 F.3d at 1155, and therefore sufficiently plead unfair business practices.

Defendants contend that they are not responsible for the consequences of their actions because Chargebacks911 "confirmed with AH Media that it corrected . . . inconsistencies" on the merchant's websites.  (*See* Mot. at 10, Ex. A.)  The Court should not consider this argument, which is based on materials outside of the Complaint.[8]  *See FTC v. Student Aid Center, Inc.*, 281 F. Supp. 3d 1324, 1338 (S.D. Fla. 2016).  In any event, Exhibit A undermines their argument.  As explained in the Complaint, these "bank pages" were not AH Media's "live sites."  (Compl. ¶¶ 54–58; Fig. F–G.)  Fixing a website that you know or should know that consumers do not visit, in order to make the website screenshots you send to banks more effective in defeating consumer chargebacks, does not counteract fraud—it enables it.

---

[8] Defendants shoehorn a document into Exhibit A that they admit is "a second version" of the document excerpted in the Complaint.  (*See* Mot. at 9.)

### 2.    Substantial Injury

The Complaint sufficiently alleges that the injury caused or likely to be caused by Defendants' "profound lack of diligence," *see Neovi*, 604 F.3d at 1153, is substantial.  Consumers whose chargebacks are denied suffer direct financial injury.  Requesting a chargeback returns the pilfered funds to the consumer's account, but losing the chargeback dispute sends their money back to the fraudulent merchant.  (Compl. ¶ 19.)  The examples alleged in the Complaint show the amounts merchants have charged consumers have been significant.  (Compl. Figs. A ($89.95), C ($24.95), D ($84.95), F ($89.95).)  Certainly, from the consumers' point of view, the charge has been significant enough that they have contacted their bank to recover it.[9]

In any event, "[a]n act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'"  *Neovi*, 604 F. 3d at 1157–58 (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985)); *see also FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1395 (M.D. Fla. 2018) ("[T]he FTC is not required to prove that an actual harm has occurred because 'the FTC Act contemplates the possibility that conduct can be unfair before actual injury occurs.'") (quoting *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015)).  Here, the practice has affected a staggering number of

---

[9] As discussed below, *see* Section III.B, consumers have also likely suffered injury to the extent that they have invested "time, trouble, aggravation, and money" in contesting Defendants' misleading representations.  *See FTC v. Elec. Payment Solutions of Am. Inc.*, 482 F. Supp. 3d 921, 931 (D. Ariz. 2020) (quotation omitted); *see also FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1395 (M.D. Fla. 2018) ("[N]either the legislative history nor the current law requires proof of tangible harm to the exclusion of intangible harm, as [the defendants] assert.").

consumers.  For just the three fraudulent merchants named in the Complaint, Defendants disputed *more than 165,000 chargebacks.*  (*See* Compl. ¶ 27.)  Few, if any, consumers should lose a chargeback dispute to these patently deceptive merchants, and yet the merchants' relationship with Defendants was lucrative enough to persist on a massive scale for years.  (*See id.* ¶¶ 26–27.)  In contrast to *FTC v. LendingClub Corp.*, where the court dismissed an unfairness claim that relied entirely on the term "numerous," the Complaint's allegations here go to the magnitude, likelihood, and scope of consumer injury, and thus at very least "giv[e] rise to a plausible inference that [Defendants' practices] have inflicted many small individual injuries on a *large* number [of] consumers."  *See* No. 18-cv-02454-JSC, 2018 WL 11436309, at *12–13 (N.D. Cal. Oct. 3, 2018) (emphasis in original).

**B.    The Complaint adequately pleads that consumers cannot reasonably avoid Defendants' unfair chargeback dispute practices.**

Chargebacks911 sends documentation to issuing banks to dispute the validity of chargebacks, and the banks then decide whether the underlying charge is valid. (Compl. ¶¶ 3, 19.)  Consumers do not have a "free and informed . . . choice" in avoiding injury because they do not have a "reason to anticipate the impending harm and the means to avoid it" or a reasonable way to "mitigate the damage afterward." *See Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (quotations omitted).  Consumers have no reason to anticipate that Defendants will dispute a valid chargeback with a misleading representment, nor can consumers choose not to engage with Defendants.  *See id.* at 1365–66; *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104,

1115 (S.D. Cal. 2008) ("Many of these consumers were neither [the defendant's] users nor customers, and had not requested [the defendant's] goods or services."), *aff'd*, 604 F.3d 1150 (9th Cir. 2010).

The Complaint also adequately pleads that consumers cannot reasonably mitigate the damage caused by Defendants' malfeasance. To contest this point, Defendants overemphasize the allegation that additional stages of dispute resolution "may be" possible after a chargeback is denied. (*See* Mot. at 16–17 (quoting Compl. ¶ 19).) In *FTC v. Electronic Payment Solutions of America Inc.* ("*EPS*"), the defendants argued, in a similar vein, that consumers could avoid injury from unauthorized charges by filing chargebacks. 482 F. Supp. 3d 921, 930 (D. Ariz. 2020). The court rejected this argument, finding that the defendants had "constructed mechanisms to frustrate the very system that they argue consumers could utilize to avoid the loss." *Id.* at 931. They had, like Defendants here, used manufactured evidence to dispute the consumers' chargebacks. *See id.* at 930–31. Defendants may also frustrate consumers' chargebacks by misleading the consumers into concluding that their own chargebacks are invalid and that they should not pursue additional dispute resolution. *See FTC v. Zamani*, No. SACV 09-0977-DOC(MLGx), 2011 WL 2222065, at \*10 (C.D. Cal. June 6, 2011) (holding that the defendants' misrepresentations deprived consumers of a free and informed choice).[10]

---

[10] In contrast with *Casey v. Florida Coastal School of Law, Inc.*, there is no reason for consumers here to "perform . . . due diligence," escalated chargeback dispute resolution procedures are not "common knowledge," and there are no other "sources of information available" about the fraudulent websites that consumers had visited weeks or months prior. *See Casey*, No. 3:14-cv-1229-J-39PDB, 2015 WL 10096084, at \*13–16 (M.D. Fla. Aug. 11, 2015).

-9-

The court in *EPS* further held that "a consumer suffers unavoidable injuries regardless of whether a credit card transaction is reversed" due to the "substantial investment of time, trouble, aggravation, and money" required to obtain reimbursement. 482 F. Supp. 3d at 931 (quoting *Neovi*, 604 F.3d at 1158); *see also FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *10 (W.D. Wash. July 22, 2016) (holding that "the time customers spent seeking refunds actually constitutes additional injury to them"). Here, too, consumers would be unavoidably burdened if they were forced to defend their valid chargebacks from Defendants' misleading representations.

In any event, as in *EPS*, the success of Defendants' representation scheme speaks for itself. *See* 482 F. Supp. 3d at 931 (finding harm was not reasonably avoidable in part because scheme caused millions of dollars in injury). If the harm from Defendants' practices had been reasonably avoidable, the fraudulent merchants would never have paid Defendants to dispute tens of thousands of chargebacks over the course of several years. (*See* Compl. ¶ 27.)

## C.    Plaintiffs amply allege that the injury from Defendants' misleading representations is not outweighed by benefits to consumers or competition.

As discussed above, *see* Section III.A.2, the Complaint adequately pleads that consumers likely have suffered direct financial harm from Defendants' misleading representations. Further, the Court may reasonably infer from the allegations that those who escalate a chargeback dispute face undue burden. *See EPS*, 482 F. Supp. 3d at 931; *Amazon*, 2016 WL 10654030, at *10. This substantial injury is not

outweighed by benefits to consumers or competition.

It is unlikely that these harms could be outweighed in any situation, but the allegations here support an inference that the challenged practice has not generated *any* offsetting benefits to consumers or competition. *See Amazon*, 2016 WL 10654030, at *11 (holding that cost-benefit prong is "easily satisfied" where "a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition") (quoting *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000)).[11] Defendants claim that "Cb911's services optimize efficiency, help reduce costs, and improve the cadence of chargeback reporting."[12] (Mot. At 18.) These purported benefits may well accrue from a chargeback dispute service generally, but the Complaint does not challenge chargeback dispute services generally—it challenges the specific practice of disputing chargebacks with "misleading or inaccurate documentation." (*See, e.g.*, Compl. ¶ 95.) The "general benefits" of a product or service are not relevant to whether Plaintiffs have adequately pleaded that the harm from a specific practice is not outweighed by countervailing benefits. *See FTC v. FleetCor Techs., Inc.*, 620 F. Supp. 3d 1268, 1338 (N.D. Ga. 2022); *see also In re*

---

[11] Defendants erroneously claim that the quoted language means that Plaintiffs "*must allege* that a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." (*See* Mot. at 17 (emphasis added) (quotation omitted)). *Amazon* merely provides an example in which the "not outweighed" standard was "easily satisfied." 2016 WL 10654030, at *8, 11.

[12] Defendants' uncited claim is not supported by allegations in the Complaint. Nor is the preceding claim that Defendants "follows the guidelines, processes and methodologies established and governed by the card networks." (*See* Mot. at 18 (misciting Compl. ¶ 24).)

*Int'l Harvester Co.*, 104 F.T.C. 949, 1065 (1984) (analyzing costs and benefits of disclosing dangerous risk from respondent's tractors, not on benefits of the tractors).

In *Roca Labs*, this Court held that the defendants' "recitation of the benefits they claim consumers received from using the products ignores the issue presented in this claim, which is whether [the defendants'] gag clause *practices*, not their products and services, presented a countervailing benefit." 345 F. Supp. 3d at 1396 (emphasis in original). Similarly, in *Amazon*, a case concerning unauthorized in-app purchases, the court held that "[t]he 'benefit' of ensuring a streamlined experience is not incompatible with the practice of affirmatively seeking a customer's authorized consent to a charge." 2016 WL 10654030, at *10.

Accordingly, the general benefits of Defendants' chargeback dispute service are irrelevant to the countervailing benefits analysis. Moreover, the purported benefits from submitting representations are "not incompatible" with submitting *truthful* representations. *See id.* Any such benefits would only be amplified if Defendants heeded the red flags about their fraudulent clients and changed their business practices accordingly.

**D.    Plaintiffs alleged facts demonstrating that Defendants' use of microtransactions has caused or is likely to cause substantial injury.**

Defendants' "Value Added Promotions" ("VAP") service has caused or is likely to cause substantial injury by undermining fraud monitoring programs that are meant to protect consumers. (Compl. ¶¶ 6, 20, 80, 87, 105, 108.) Plaintiffs alleged that Defendants offered this service for six years (*id.* ¶ 79), that more than 30

merchants used this service, and that more than four million transactions were involved (*id.* at 86), which indicates that the scheme successfully allowed merchants to evade scrutiny and account termination. These allegations are more than legal conclusions couched as factual allegations. *See Twombly*, 550 U.S. at 555.

Defendants orchestrated a scheme where they ran small-value transactions through their clients' merchant accounts using prepaid gift cards. (*Id.* ¶¶ 79–80.) The merchants then offered their clients promotional credits equivalent to these "microtransactions," few of which were ever claimed. (*Id.* ¶ 82.) These transactions did not reflect bona fide sales to consumers, but instead inflated the total number of transactions, and thereby artificially lowered the accounts' monthly chargeback rates. (*Id.* ¶¶ 6, 79-82.) Merchants that would have been subject to consequences, such as additional monitoring requirements, penalties, and termination, were enabled to continue taking money from consumers.[13] (*Id.*)

This Court's recognition that "suppress[ing] negative information" can cause substantial injury further supports a finding that Plaintiffs sufficiently pleaded this element. *See Roca Labs*, 345 F. Supp. 3d at 1395. In *Roca Labs*, the defendants' gag clause practices prevented customers from making negative comments, and the absence of the negative information "could make a consumer more inclined to purchase." *Id.* At 1393–95. In a similar vein, VAP hid merchants' high chargeback

---

[13] Defendants miss the forest for the trees by claiming that Plaintiffs "do not allege that any fraudulent transactions were generated because of VAP." (*See* Mot. at 12.) The Complaint clearly alleges that Defendants ran the VAP transactions *regardless* of whether customers claimed the free credits and for the purpose of artificially lowering the client's chargeback rate. (Compl. ¶¶ 79–82.)

rates from credit card networks, and the absence of the negative information allowed merchants to avoid termination or other consequences and made merchants more likely to continue charging consumers. (Compl. ¶¶ 6, 79–87.)

The Complaint specifically alleges two examples where merchants avoided consequences by using VAP (Compl. ¶ 87), thereby undermining the monitoring systems in place to protect consumers from fraud. (*See id.* ¶¶ 6, 20.) Additionally, as noted above, *see* Section III.A.1, Plaintiffs are not required to identify harmed consumers in the Complaint. Moreover, avoiding fraud monitoring programs by artificially lowering chargeback rates is not just a "predictable consequence" of VAP—it is the only point. *See Neovi*, 604 F.3d at 1156; (Compl. at 79). If VAP had not been successful in maintaining access to merchant accounts that should be subject to scrutiny, there was no reason for more than 30 merchants to pay Defendants for more than four million VAP transactions over the course of several years.[14] (*See* Compl. ¶¶ 79, 86, 88.) Also, if VAP were a genuine promotional program, there would be no reason for Defendants to conceal it. (*See id.* ¶ 85 ("[C]an [you] drip them a little slower to not make it look suspicious[?]").)

**E.    The Complaint alleges consumers could not reasonably avoid VAP.**

Consumers could not avoid the VAP transactions made without their

---

[14] Defendants claim that VAP is "directionally inconsistent" with fraudulent merchants conducting sales through a revolving door of merchant accounts. (Mot. at 12.) They have the logic exactly backwards. Due to the difficultly in maintaining access to accounts, fraudulent merchants would open as many accounts as possible, and then use VAP to maximize the lifespan of those accounts. (*See, e.g.*, Compl. ¶¶ 72.a, 86 (Apex Capital opened nearly 300 merchant accounts *and* used VAP.).)

knowledge (*see* Compl. ¶ 82) any more than they could avoid the consequence of those transactions—fraudulent businesses evading chargeback monitoring protections that should have been triggered but that Defendants had "assiduously prevented from being available." *See Roca Labs*, 345 F. Supp. 3d at 1395–96.

**F.    Plaintiffs sufficiently pleaded that the harm from VAP was not outweighed by countervailing benefits.**

VAP's only purpose was to undermine chargeback monitoring safeguards that were intended to protect consumers (*see, e.g.*, Compl. ¶¶ 79–80), and thus it did not generate benefits that outweighed the harm it caused. *See* Section III.D.  Defendants argue that the gift cards were a benefit to consumers (Mot. at 18), but as alleged in the Complaint, the credits were merely a pretext to hide the true purpose of VAP from financial institutions and should be disregarded. (*See* Compl. ¶¶ 79–80, 85.)

Even taking the credits at face value, they are not cognizable as a benefit of the challenged practice because providing the credits was "not incompatible" with running only bona fide transactions through merchant accounts. *See Amazon*, 2016 WL 10654030, at *10.  The unlawful practice in the VAP scheme is not providing credits to consumers, it is running a transaction in the consumer's name *even when the consumer did not claim the credit*. (Compl. ¶ 82.)  Further, the credits were designed so that few consumers would claim them—they were low in value and required a phone call to redeem—and, predictably, few consumers did. (*See id.* ¶¶ 80, 82.)

**G.    The Complaint sufficiently alleges the factual basis for injunctive relief.**

This Court may issue an injunction "if a violation is ongoing or likely to

recur." *FTC v. Citigroup Inc.*, 239 F. Supp. 2d 1302, 1306 (N.D. Ga. 2001).  Where a defendant's conduct has ceased, it is well settled in the Eleventh Circuit that "permanent injunctive relief is appropriate if the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 975 (11th Cir. 2011) (quotations omitted); *see Roca Labs*, 345 F. Supp. 3d at 1398 ("A permanent injunction is appropriate when there is a cognizable danger of recurrent violation.") (quotations omitted).[15]  In making this determination, courts consider factors including:

> the egregiousness of the defendant's actions; the isolated or recurrent nature of the actions; the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the defendant's recognition of the wrongful nature of his conduct; and the likelihood that the defendant's occupation will present opportunities for future violations.

*FTC v. FleetCor Techs., Inc.*, 620 F. Supp. 3d 1268, 1344 (N.D. Ga. 2022).

Additionally, under FDUTPA, the Florida AG may seek an injunction against those who have violated, are violating, or are otherwise likely to violate FDUTPA. Fla. Stat. § 501.207(b).  Regardless of whether actual harm has materialized, the Florida AG can seek an injunction to stop an unfair or deceptive trade practice that violates FDUTPA.  *Office of Att'y Gen. v. Bilotti*, 267 So. 3d 1, 3 (Fla. 4th DCA 2019). Plaintiffs clearly alleged prior unfair and deceptive acts, which if taken as true, amount to FDUTPA violations supporting an injunction under FDUTPA.  *See*

---

[15] Defendants mistakenly cite the standard for *preliminary* injunctions, referencing cases where non-governmental plaintiffs sought extraordinary pre-judgment relief.  (*See* Mot. at 18–19.)  No such relief is sought here, so there is no need to show "imminent, irreparable harm."  (*See id.* at 20.)

Sections III.A–F.

Plaintiffs have alleged ongoing conduct: Defendants have submitted *and continue to* submit misleading representations to challenge chargebacks. (Compl. ¶¶ 4–5.) Assuming arguendo that Defendants' misleading representations were all in the past, Plaintiffs have provided sufficient allegations to demonstrate a likelihood that Defendants would violate the law in the future. The Complaint shows that Defendants' conduct was egregious and recurrent, that they have actively avoided responsibility for their actions, and that they have ample opportunity to continue their unlawful practices. *See FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1289 (M.D. Fla. 2016) (granting permanent injunction where the defendants' actions "were egregious and recurrent over several years, despite numerous consumer complaints, as well as investigations and inquiries by state authorities"). Defendants' conduct has been expansive—for just the three fraudulent merchant clients cited in the Complaint, Defendants submitted tens of thousands of misleading representations.[16] (Compl. ¶ 27.) Defendants also ignored numerous red flags and have continued their practices undeterred for years. (*Id.* ¶¶ 41, 60–67.) Moreover, they have sought to evade detection by "tak[ing] direct steps to prevent banks from assessing whether its clients are engaged in prohibited practices." (*Id.* ¶ 42.)

---

[16] The Complaint provides several examples of Defendants' misconduct, and awareness of red flags, involving clients that were subject to FTC lawsuits. (*See, e.g.*, Compl. ¶ 35.) These instances are expressly labeled as *examples*, and key factual allegations refer to the company's clients more generally. (*See, e.g.*, *id.* ¶¶ 41, 67 ("negative-option clients"); 42, 68, 71, 73, 76 ("clients"); 44 ("the merchant").) Defendants' attempt to circumscribe the allegations to only the named clients, and to suggest the age of the examples prohibits relief, is unavailing. (*See* Mot. at 19–20.)

Defendants' brazen use of VAP further demonstrates Defendants' disregard of the law.  (*Id.* ¶ 84.)  Defendants try to powder over these allegations by arguing that their cover story—based on the nominal (and overwhelmingly unused) gift cards—justifies the damage they caused by helping fraudulent merchants evade scrutiny.  (*See* Mot. at 18; Compl. ¶¶ 79–82.)  This was not an isolated incident; Defendants offered VAP as a service for at least six years.  (Compl. ¶ 79.)

Defendants still operate a chargeback mitigation business (*id.* ¶ 3) and could easily resume their unlawful use of VAP.  *See FleetCor Techs*, 620 F. Supp. 3d at 1346 ("[S]uch voluntary cessation is not adequate to protect against future violations where [the defendant] is easily able to [resume the violative conduct] anew.").  In *USA Financial*, it was undisputed that the defendant had ceased its unlawful conduct prior to the FTC lawsuit.  415 Fed. Appx. at 975.  The Eleventh Circuit upheld the issuance of a permanent injunction, finding it necessary to prevent future law violations, and noting that the defendants' "formation of new corporate entities to facilitate their violations . . . demonstrates an unwillingness to comply with the law." *Id.*  Here, Defendants' attempts to conceal the true purpose of this lucrative service from acquiring banks shine a light on their willingness to violate the law.  (Compl. ¶¶ 79, 85 ("[I] [don't] like the way [a client is] running vap, too much all too late . . . [it's] going to alert their [acquirers]"), 88.)  Given the allegations going to the egregiousness of Defendants collecting millions from their VAP services over a period of years, their efforts to disguise the practice, and the opportunity for future violations, it is premature on a motion to dismiss to rule out ultimate injunctive relief

-18-

addressing VAP.  *See Citigroup*, 239 F. Supp. 2d at 1306 ("Based upon the foregoing,

it does not appear beyond doubt that the plaintiff can prove no set of facts which

would entitle it to relief.") (quotations omitted).

**H.    The FTC's allegations are sufficient to show that it has reason to believe Defendants are violating or are about to violate the law.**

Section 13(b) of the FTC Act authorizes the Commission to initiate a suit in

district court when the Commission has reason to believe a defendant is violating or

about to violate Section 5 of the FTC Act.  15 U.S.C. § 53(b).  As discussed in

Section III.G, the Complaint is "replete with allegations specifying ongoing

violations," *see FTC v. SPM Thermo-Shield, Inc.*, No. 2:20-cv-542-FtM-38MRM, 2020

WL 6545975, at *2 (M.D. Fla. Nov. 6, 2020), concerning Defendants misleading

practices in submitting representations.

By the detailed allegations in the Complaint, the FTC has shown that it has

reason to believe that Defendants' practices in connection with its VAP scheme are

likely to recur.  When determining whether the FTC has sufficiently pled its "reason

to believe" that violations of the FTC are about to occur, courts in this Circuit have

held that allegations about a defendant's past conduct can "support a reasonable

inference that the behavior will reoccur."  *See FTC v. Hornbeam Special Situations,

LLC*, 391 F. Supp. 3d 1218, 1222–23 (N.D. Ga. 2019) (noting that "the FTC may

bring suit  . . . '*[w]henever the Commission has reason to believe*' the law is about to be

violated" and "[t]he standard . . . in §53(b) is not necessarily an objective one"

(emphasis in original)) (request for interlocutory review denied by Eleventh Circuit);

**-19-**

*see also FTC v. Romero*, No. 5:21-cv-343-BJD-PRL, 2022 WL 4095424, at *3 (M.D.

Fla. June 29, 2022) ("While this court is not yet at the point to determine whether to

grant permanent injunctive relief, at this stage of litigation, Plaintiff offered

allegations that could be construed as positive proof of the likelihood that the

wrongdoing will recur.") (quotation omitted).

In improperly trying to argue that the Complaint is stale, Defendants omit the

material fact that Defendants entered into a Tolling Agreement with the FTC in June

2020.  The Agreement explicitly prohibits Defendants from referencing the time

between the date of the Agreement (June 3, 2020) until the FTC filed the instant

Complaint in advancing an argument that the FTC failed to satisfy the Section 13(b)

requirement that Defendant "'is violating' or 'is about to violate' the law."[17]

Accordingly, for the purposes of determining the timeliness of the FTC's VAP

allegations, the Court here should consider only the passage of time from 2019, when

Defendants allegedly ceased effecting microtransactions, until June 2020.

Defendants skirt the precedent from courts in the Eleventh Circuit and instead

point to out-of-Circuit cases, some of which do not even discuss what constitutes

adequate "reason to believe."  *See FTC v. Shire ViroPharma*, 917 F.3d 147, 159 n.17

(3d Cir. 2019) (expressly declining to consider what constitutes "reason to believe");

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772–75 (7th Cir. 2019) (evaluating

statutory language in context of the FTC seeking restitution, but not discussing what

---

[17] The FTC respectfully offers to file the Tolling Agreement should the Court wish to review it.

**-20-**

"reason to believe" means).  Defendants' citation to *FTC v. Facebook* is also not instructive here.  581 F. Supp. 3d 34 (D.D.C. 2022).  First, the *Facebook* court diverges from the precedent in this Circuit.  *Compare id.* at 59–60 *with Romero*, 2022 WL 4095424, at *2.  Second, Defendants are wrong to analogize a "four-year temporal gap."[18]  (*See* Mot. at 20.)  Defendants here agreed to toll these very claims starting in June 2020.  The operative period here is only the time from when Defendants may have ceased the VAP program, in 2019, until June 2020. Defendants cite to no cases where such a short amount of time was grounds for contradicting the FTC's reason to believe a defendant is about to violate Section 5.

## I.    The Florida AG's FDUTPA counts are not time barred.

The Complaint is replete with factual allegations of ongoing business practices or practices that occurred within the past four years[19] that would allow this Court to draw the reasonable inference that Defendants are liable for FDUTPA violations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Some specific examples of which include the following: (i) since at least 2011, Chargebacks911 has offered chargeback mitigation services to merchants (Compl. ¶ 21); (ii) Chargebacks911disputed more than 77,000 chargebacks for AH Media and Zanelo from January 2017 to July 2019 (*id.* ¶ 27); (iii) Chargebacks911 used misleading "bank pages" in their representations

---

[18] All but one instance of the complained-of behavior in *Facebook* was at least seven years prior to the complaint.  *Facebook*, 581 F. Supp. 3d at 53.

[19] Defendants misstate the governing statute setting forth the statute of limitations.  (*See* Mot. ¶ 20.) Section 501.207(5), Florida Statutes, states:  "No action may be brought by the enforcing authority under this section more than 4 years after the occurrence of a violation of this part or more than 2 years after the last payment in a transaction involved in a violation of this part, whichever is later."

while disputing chargebacks on behalf of AH Media, of which Chargebacks911 knew or should have known, and issuing banks likely relied on these bank pages in denying consumers' chargebacks (*id*. ¶¶ 38–40); (iv) representations submitted on behalf of AH Media reflected (a) inconsistent branding in the consumer's order information compared to that in the representation screenshots (*id*. ¶ 51), and (b) that actual websites used to sell AH Media's products lacked disclosures that were included on the "bank pages" (*id*. ¶¶ 58–59); (v) after being put on notice, Chargebacks911 did not meaningfully investigate whether its representation screenshots were misleading (*id*. ¶ 67); (vi) between February 2017 and April 2019, Chargebacks911 disputed more than 10,000 chargebacks for AH Media for a single product sold on more than 150 separate merchant accounts (*id*. ¶ 72(c)); and (vii) from 2013 through 2019 Chargebacks911 offered certain clients its VAP service[20] (*id*. ¶ 79).  Additionally, many of the Complaint's factual allegations refer to business practices or other at-issue conduct that started in the past and continue into the present.[21]  Merely providing specific examples outside of the past four years does not render moot the remaining allegations in the Complaint.  Dismissal is not warranted here because it is not apparent from the face of the Complaint that Counts III and IV[22] are time barred.

---

[20] See Section III.D for a discussion of the VAP service.

[21] (Compl. ¶¶ 4–7, 28–37, 42–44, 72, 78, 89–92, 116–20, 122–25, 127–28, 130–31, 134–38, 140–49.)

[22] Defendants did not move to dismiss Count V on this basis.  (Mot. at 22.)  Also, Defendants only claimed the activity of Chargebacks911 was exempt; hence, the Florida AG is not addressing the activity of Defendants Cardone and Eaton.  (Compl. ¶¶ 14–15, 89–91; Counts IV, V.)

**J.**     **Defendants' conduct is not exempt from FDUTPA as a banking activity.**

While FDUTPA does have limited exemptions to its application, Defendants'

conduct does not fall under what they refer to as the "Banking Activity Exemption"

set forth in Section 501.212(4)(b)–(c), Florida Statutes.[23]  Also, Section 501.212

should not be interpreted in a way to render it meaningless.  *See State v. Goode*, 830

So. 2d 817,824 (Fla. 2002).[24]  Defendants illogically argue that because issuing and

acquiring banks are regulated and licensed financial institutions, Chargebacks911

should similarly be exempt from FDUTPA.  (*See* Mot. at 23.)  It is undisputed that

Chargebacks911 is not a financial institution, nor does it even perform services for

financial institutions.  (Compl. ¶¶ 3, 21–24; Mot. at 4.)  It is undisputed that

Chargebacks911 helps merchants, such as AH Media, Apex Capital, and F9

Advertising described in the Complaint, fight chargebacks initiated by consumers.

(Compl. ¶¶ 3, 21–24, 26.)  Defendants admit that "Cb911 offers chargeback response

services to merchants where it helps compile and submit representations on behalf of

those merchants."  (Mot. at 4 (citing Compl. ¶¶ 21, 28).)  It is also undisputed that

Chargebacks911 gathers data from the merchant concerning the product at issue,

---

[23] Section 501.212(4), Florida Statutes, states that FDUTPA does not apply to "(4) Any person or activity regulated under laws administered by: (a) The Office of Insurance Regulation of the Financial Services Commission; (b) Banks, credit unions, and savings and loan associations regulated by the Office of Financial Regulation of the Financial Services Commission; (c) Banks, credit unions, and savings and loan associations regulated by federal agencies; or (d) Any person or activity regulated under the laws administered by the former Department of Insurance which are now administered by the Department of Financial Services."  Defendants failed to argue that that they are, or their activity is, regulated by the Office of Financial Regulation of the Financial Services Commission, so the focus here will be on Section 501.212(4)(c).

[24] "[T]he Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless."  *Goode*, 830 So. 2d at 824.

collects images of the merchant's website from when the merchant registered with its acquiring bank, and may provide text boxes and overlays on such images to emphasize information that may be relevant. (*Id.* (citing Compl. ¶¶ 43, 29, 32–33).)

Defendants generally refer to the Fair Credit Billing Act, 15 U.S.C. §§ 1601 *et seq.*, as the creator of the chargeback mechanism, but fail to cite any specific authority regulating their conduct. Similarly, without providing any analysis of the regulation, Defendants refer to 12 C.F.R. § 1026.13(b)(1), which is a portion of Regulation Z regarding "billing error resolution."[25] Section 1026.1 of Regulation Z provides that "this part applies to each individual or business that offers or extends credit, other than a person excluded from coverage of this part by section 1029 of the Consumer Financial Protection Act of 2010." *Id.* § 1026.1(c). Neither Defendants, nor the merchants for whom they perform the at-issue services, are businesses offering or extending credit. (Compl. ¶¶ 3, 21–24; Mot. at 4.) Additionally, Section 1026.13 sets forth the obligations of creditors (as defined therein) if they receive a written notice from a consumer of a billing error—i.e., a chargeback, and required disclosures to the consumer. 12 C.F.R. § 1026.13. None of Defendants are a "creditor" under Regulation Z, nor do they perform the activities of a creditor. *See id.* § 1026.2(17). Therefore, Regulation Z clearly does not apply to Defendants or the services they perform on behalf of merchants. Simply because issuing and acquiring

---

[25] CFPB issued Regulation Z to implement the Federal Truth in Lending Act, and certain provisions of the Competitive Equality Banking Act of 1987, the Real Estate Settlement Procedures Act of 1974 and the Financial Institutions Reform, Recovery, and Enforcement Act. 12 C.F.R. § 1026.1(a).

banks are responsible for "analyzing and ruling on representations" and that such banks "administer the chargeback process" (Mot. at 23), this does not transform all activity related to this process—including the services performed by Chargebacks911 on behalf of merchants—exempt from FDUTPA.  To interpret Section 501.212 in this manner would render it meaningless.  *See Goode*, 830 So. 2d at 824.

Furthermore, Defendants' reliance on *Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176 (M.D. Fla. 2022), is misguided.  First, one defendant in *Farmer* was Humana—an insurance company, which was clearly exempt from FDUTPA under Section 501.212(4)(a), and the Court did not even have to analyze its activity.  *Id.* at 1189–90.  Second, the Court allowed a portion of the FDUTPA action to proceed against another entity, Cotiviti, even though it was a vendor performing insurance related activities on behalf of Humana.[26]  *Id.* at 1190–92.  The Court allowed the request for an injunction under FDUTPA to proceed and dismissed the portion seeking damages because the plaintiff failed to allege a required element of a private cause of action (a non-enforcement action) under FDUTPA.  *Id.*  This Court should find that Chargebacks911 is not exempt from FDUTPA because providing chargeback mitigation services on behalf of merchants is not regulated by federal agencies or the Office of Financial Regulation.

## IV.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion.

---

[26] It does not appear that the *Farmer* Court analyzed Cotiviti's activities under Fla. Sta. § 501.212(4).

Respectfully submitted,

Dated:  July 20, 2023

 /s/ Evan Rose
EVAN ROSE (Lead Counsel)
Cal. Bar No. 253478
ROBERTA DIANE TONELLI
Cal. Bar No. 278738
DENISE M. OKI
Cal. Bar No. 311212
90 Seventh St, Suite 14-300
San Francisco, CA 94103
Email: erose@ftc.gov; rtonelli@ftc.gov;
doki@ftc.gov
Tel: (415) 848-5100; Fax: (415) 848-5184

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION


ASHLEY MOODY
ATTORNEY GENERAL

 /s/ Jennifer Hayes Pinder
Jennifer Hayes Pinder
Senior Assistant Attorney General
Fla. Bar No.: 17325
Email: Jennifer.Pinder@myfloridalegal.com
Office of the Attorney General
Department of Legal Affairs
3507 East Frontage Rd, Suite 325
Tampa, FL 33607
Phone: 813-287-7950
Fax: 813-281-5515

(Signed by filing lawyer with permission of
non-filing lawyer)

 /s/ Evan Rose
EVAN ROSE